IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

FLORINDA SPAULDING,

      Plaintiff,

v.                          CASE NO. 2:09-cv-00962

MICHAEL J. ASTRUE,
Commissioner of Social Security,

      Defendant.

## M E M O R A N D U M   O P I N I O N

This is an action seeking review of the decision of the Commissioner of Social Security denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433.  This case is presently pending before the court on cross-briefs for judgment on the pleadings. Both parties have consented in writing to a decision by the United States Magistrate Judge.

Plaintiff, Florinda Spaulding (hereinafter referred to as "Claimant"), filed an application for DIB on November 1, 2006, alleging disability as of June 30, 2004, due to diabetes, depression, headaches, high blood pressure, and kidney problems. (Tr. at 9, 113-18, 133-42, 180-86, 201-07.)  The claim was denied initially and upon reconsideration.  (Tr. at 9, 57-61, 64-66.)  On May 3, 2007, Claimant requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. at 9, 68, 72, 76, 80.)  The hearing was

held on August 7, 2008 before the Honorable Michelle D. Cavadi. (Tr. at 22-54, 92-101.)  By decision dated October 10, 2008, the ALJ determined that Claimant was not entitled to benefits.  (Tr. at 9-21.)   The  ALJ's  decision  became  the  final  decision  of  the Commissioner  on  July  28,  2009,  when  the  Appeals  Council  denied Claimant's request for review.  (Tr. at 1-3.)  On August 24, 2009, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5), a claimant for disability has the burden of proving a disability.  See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972).  A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The  Social  Security  Regulations  establish  a  "sequential evaluation" for the adjudication of disability claims.  20 C.F.R. § 404.1520 (2002).  If an individual is found "not disabled" at any step,  further  inquiry  is  unnecessary.   Id. § 404.1520(a).   The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment.  Id. § 404.1520(b).  If the claimant is not, the second inquiry is whether claimant suffers from  a  severe  impairment.   Id. § 404.1520(c).   If  a  severe impairment is present, the third inquiry is whether such impairment

meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4.  Id. § 404.1520(d).  If it does, the claimant is found disabled and awarded benefits.  Id.  If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work.  Id. §§ 404.1520(e).  By satisfying inquiry four, the claimant establishes a prima facie case of disability.  Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).  The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. § 404.1520(f) (2002).  The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy.  McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she has not engaged in substantial gainful activity since the alleged onset date.  (Tr. at 11.)  Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments of status post excision of brain tumor

3

(times two) with residual headaches and obesity.  (Tr. at 11-15.)
At the third inquiry, the ALJ concluded that Claimant's impairments
do not meet or equal the level of severity of any listing in
Appendix 1.  (Tr. at 15.)  The ALJ then found that Claimant has a
residual functional capacity for light work, reduced by
nonexertional limitations.  (Tr. at 15-19.)  Therefore, Claimant
can return to her past relevant work.  (Tr. at 19.)  The ALJ
concluded that Claimant could perform her past relevant work as an
accounts receivable clerk and accounts receivable/purchasing agent.
(Tr. at 19.) In the alternative, even if the claimant were unable
to return to past relevant work, the ALJ determined that there are
jobs that exist in significant numbers in the national economy that
the claimant can perform, such as price markers, assemblers, night
cleaners, bench workers, surveillance systems monitors, and machine
tenders.  (Tr. at 20-21.)  On this basis, benefits were denied.
(Tr. at 22.)

Scope of Review

       The sole issue before this court is whether the final decision
of the Commissioner denying the claim is supported by substantial
evidence.   In Blalock v. Richardson, substantial evidence was
defined as

                "evidence which a reasoning mind would accept
                as   sufficient   to   support   a   particular
                conclusion. It consists of more than a mere
                scintilla of evidence but may be somewhat less
                than a preponderance. If there is evidence to
                justify a refusal to direct a verdict were the

4

case before a jury, then there is 'substantial evidence.'"

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).  Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."  Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was 54 years old at the time of the administrative hearing.  (Tr. at 27.)  She is a high school graduate and attended two colleges but did not complete a degree.  (Tr. at 28, 328.)  In the past, she worked as an accounts receivable clerk and purchasing agent.  (Tr. at 28-29, 50-51.)

The Medical Record

The court has reviewed all evidence of record, including the medical evidence of record, and will summarize it below.

Physical Evidence

Records indicate Claimant was treated five times at University Women's and Family Care from August 11, 2004 to December 10, 2005.

(Tr. at 212-23.) Although the handwritten notes are largely illegible, it appears Claimant primarily received treatment for headaches and medication management. (Id.) The initial intake report dated August 11, 2004 notes that Claimant had a "meningioma[1] removed in 1997. S/P [status post] craniectomy 1997... pt [patient] did well 1997-2002/03...vertigo spells." (Tr. at 223.)

On November 1, 2004, Claimant had an echocardiogram and treadmill stress test at South Charleston Cardiodiagnostics, LLC, per the request of Linda Kessinger, M.D. (Tr. at 209-211.) K.K. Challa, M.D. interpreted the tests:

> All areas of the left ventricle contract normally...
> Conclusion:
> 1) Duel isotope stress test without any ischemia or scar.
> 2) No regional wall motion abnormalities are seen.
> 3) L.V.Ej.Fr.OF 59%.
> 4) Negative exercise EKG...No angina, arrhythmia, or ischemia at heart rate of 145/BPM [beats per minute]

(Tr. at 210-11.)

On August 6, 2004, Claimant had a brain MRI at Tri-State MRI, interpreted by Charles M. Siegler, M.D.: "Indication history of meningioma and craniotomy...Impression: There is abnormal dural enhancement. However the thickness is no greater than 3 mm and there is no abnormal mass effect. Might consider a follow-up study to ensure stability of the finding. No intracranial signal

---

[1] Meningiomas are usually slow-growing noncancerous tumors that develop from the meninges, the protective linings of the brain and spinal cord. They can be difficult to remove completely and can recur. Http://www.mayoclinic.org/meningiomas/

abnormalities are present." (Tr. at 228.)

On August 23, 2004, Claimant had a brain MRI at Tri-State MRI, interpreted by Rodger Blake, M.D.: "History of meningioma. Follow-up abnormal MRI. Status Post Resection of Meningioma...Impression: Normal MRA Circle of Willis." (Tr. at 229.)

Records indicate Claimant was treated at Harts Health Clinic from June 10, 2004 through November 27, 2006. (Tr. at 266-308, 316-17.) Although the handwritten notes are largely illegible, it appears that Linda Kessinger, M.D. treated and prescribed medications for Claimant's hypertension, hyperlipidemia, gastroesophageal reflux, diabetes, obesity, and chest pain. (Tr. at 267, 276, 281.)

On September 24, 2004, Claimant had a CT abdomen and pelvis at Cabell Huntington Hospital. (Tr. at 313.) Rick Compton, M.D. found "There is no evidence of ascites, abnormal mass or acute inflammatory process. Impression: Fatty liver, small hiatal hernia. Right nephrolithiasis [kidney stone]... No acute pelvic findings." (Id.)

On October 22, 2004, December 17, 2004, March 17, 2006, July 18, 2006, and January 16, 2007, Arif Goreja, M.D. reported that he treated Claimant for proteinuria. (Tr. at 347-60.) On March 17, 2006, he stated: "Weight is 275.5, which is up from 256 on her last visit in December of 2004." (Tr. at 355.) On January 16, 2007, he stated: "She certainly does not like to take her medications. She

has been instructed to lose weight, however, she has been unsuccessful in doing that...Weight is 270. Height is 5 feet 5 inches. Body mass index is 37...The patient has gone through dietary counseling in the past through a certified dietician." (Tr. at 347-48.)

On November 16, 2004, Claimant had a brain MRI at Tri-State MRI, interpreted by Marsha Anderson, M.D.: "History: ...The patient has had a frontal craniotomy...Impression: Post-Craniotomy change with no evidence of recurrent neoplastic involvement." (Tr. at 230.)

On November 25, 2005, Claimant had a brain MRI at Tri-State MRI, interpreted by Rodger Blake, M.D., wherein he noted that the significance of a "plaque-like area of soft tissue located 4 mm deep to the scalp and immediately superficial to the plate is uncertain. No prior study is available for review. Correlation with reason for patient's prior skull surgery is recommended." (Tr. at 231-32.)

On December 15, 2005, Paul D. Akers, M.D. of Tri-State MRI compared the study of November 25, 2005 with the study from November 16, 2004 and August 6, 2004: "The area of signal abnormality just superior to the craniotomy prothesis was present dating back to August of 2004. Aside from decreased contrast enhancement, this is unchanged and most likely post surgical." (Tr. at 232.)

On February 3, 2006, Rida Mazagri, M.D. reported that Claimant was referred to him by Dr. Tommasina Papa-Rugino, M.D. of University Women's and Family Care. He examined Claimant and made these findings:

Chief Complaint: Headache with a lump on her head...

Radiological Examination: The patient did have a MRI of the brain, the last one November 2005, where it shows evidence of skull resection with metal plating, no involvement of the brain tissue, there is about 4 millimeters abnormality of the plate, of unknown etiology. According to the radiology report, comparing it with the previous MRI, it does not seem to have increased in size.

Impression/Plan: This is a 52 year-old female with a lump as well as pain involving the front of the head of unknown etiology at this time. My understanding is that her previous tumor was meningioma. The patient indicated that the lump is definitely bigger comparing to before and this could represent a recurrence even though the tissue seems to be above the plate. In any case, the patient was adamant to have surgery. Before pursuing any surgical treatment I would like to obtain a CT of the head with contrast to further assess the lesion and further diagnostic and therapeutic measures will be decided according to the patient's neurologic status and radiologic findings.

(Tr. at 264-65.)

On February 9, 2006, Claimant had a follow-up examination with Dr. Mazagri, M.D. wherein he re-examined Claimant, discussed different treatment options, and Claimant agreed to proceed with surgery. (Tr. at 257-59.)

On February 21, 2006, Claimant was admitted to St. Mary's Medical Center for a skull tumor recurrence, had surgery, and was discharged on February 28, 2006. (Tr. at 234-43.) Rida Mazagri,

M.D., performed the surgery and wrote the discharge summary:

> History of Present Illness/Hospital Course:
> This 52-year-old female who presented with a skull tumor
> recurrence, did have surgery under general anesthesia,
> where she had excision to the scalp tumor and further
> dissection was a meningioma, recurrent. The patient had
> removal of the old plates and they were replaced with a
> new plate as well as methylacrylic cement cranioplasty.
> The patient tolerated the procedure well. During the
> surgery, we had to remove some of the skin, which
> infiltrated the tumor, and the skin was closed under
> tension despite undermining the skin. I was concerned
> about the possible dehiscence. Plastic surgeon was
> consulted, and Dr. Spindel felt that the wound looked
> fine, and we will continue to observe that. The patient
> continued with antibiotics, and I gave her a prescription
> of Cipro and discharged home in good condition on
> February 28, 2006. She will see Dr. Spindel in two days
> and remove the sutures in about 10 days. The patient
> also had a new symptomatology of a lump behind the right
> ear, and that will be observed in the coming few weeks.
> The patient had an uneventful course in the hospital and
> discharged home in good condition.

(Tr. at 234.)

Claimant had follow-up examinations with Dr. Mazagri, M.D. on

March 8, 2006, April 19, 2006, September 21, 2006, and October 10,

2006. (Tr. at 255-56, 260-63.)

On August 18, 2006, Claimant was admitted to St. Mary's

Medical Center after she "stepped in a hole and fell...injury to

right arm and left ankle." (Tr. at 246-47.) Claimant underwent

x-rays of the left foot, right shoulder, right elbow, right

humerus, and right forearm. (Tr. at 248-54.) Tim Daly, M.D.

stated : "They are remarkable for the left foot showing a PIP joint

dislocation. The patient tells me that this is a birth abnormality

[and] is not new or acute. Also seen was displaced radial head

10

fracture...The patient's arm was placed in a sling for immobilization and support...Discharged home." (Tr. at 248.)

On September 13, 2006, Claimant had a brain MRI at Tri-State MRI, interpreted by Joseph Dransfeld, M.D.:

> History: Follow-up skull tumor, meningioma. Correlation with prior examinations.
>
> Normal appearance of the brain and ventricles. Previous frontal craniotomy. There is artifact created from prosthetic fatty material.
>
> There is no evidence of recurring tumor or new area of abnormal enhancement. Orbits and sinuses normal.
>
> Impression: Stable appearance of the brain with no evidence of recurring tumor following surgical resection.

(Tr. at 233.)

On September 21, 2006, Claimant had chest x-rays at St. Mary's Medical Center. The testing was ordered by Dr. Mazagri due to Claimant's complaints of chest pain. (Tr. at 244.) Joseph Dransfeld, M.D. compared the results to a February 9, 2006 study and concluded: "No change. Normal heart size. The lungs are clear. Small axial hiatal hernia is present and stable. Conclusion: Negative exam." (Id.)

On October 3, 2006, Dr. Mazagri performed additional surgery on Claimant and removed a "left parietal skull screw." (Tr. at .) 243. Dr. Mazagri explained:

> Over the last several months, the patient has an area where it is very sensitive to touch, treated conservatively, and unfortunately continued to be symptomatic. The patient was brought to surgery for exploration and removal of most probably a screw, which

11

is bulging and putting pressure on the skin from previous
surgery...The patient tolerated the procedure well and
was transferred to the recovery room in satisfactory
condition.

(Tr. at 241.)

On November 8, 2006, Dr. Mazagri reported:

**Physical Examination**: Her incision healed well.  She is
still complaining of headaches but no tenderness over the
plate site.  She has mild restriction of neck movements
where she has some neck pain as well.  She is moving all
four extremities well with good strength and tone,
sensation is intact.  The patient walked into the room
normally with no evidence of limping.  She has normal
muscle strength in all four extremities with normal gait.

**Impression/Plan**: The patient's symptomatology of
headaches is most probably related to cervical
spondylosis.  The patient was advised to continue with
daily exercises to further strengthen her neck
musculature.  I gave her a prescription for Voltaren and
she will be reassessed again in a few months for further
evaluation.

(Tr. at 260.)

Records indicate Claimant was treated at West Virginia Health
Right, Inc. seven times from November 28, 2006 to July 26, 2007.
(Tr. at 398-404.) Although the handwritten notes are largely
illegible, notes from December 22, 2006 state "Obesity, DM II,
GERD, HTN.  Client to work on weight loss, low fat diet." (Tr. at
402.)

On December 19, 2006, Claimant had hepatobiliary scan at CAMC
per the request of WV Health Right.  Steven A. Artz, M.D. stated:

HISTORY: This is a patient with right upper quadrant
pain.  The patient was injected with 5.3 mCi of Tc99m
Choletec.   The intra and extrahepatic ducts are
visualized at 20 minutes as is the gallbladder.  Tracer

12

is seen in the small bowel at approximately the same time.

IMPRESSION: Negative study.

(Tr. at 406, 421.)

On December 21, 2006, a State agency medical source completed a Physical Residual Functional Capacity Assessment and opined that Claimant could perform light work with the exertional ability to occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk and sit (with normal breaks) for a total of about 6 hours in an 8-hour workday, and to have unlimited push and/or pull abilities. (Tr. at 320.)  Claimant was found to be able to occasionally perform all postural activities except climbing ladder/rope/scaffolds. (Tr. at 321.)  These limitations were noted to be "due to obesity BMI [body mass index] 41." (Id.) Claimant was determined to have no manipulative, visual, or communicative limitations. (Tr. at 322-23.) Claimant's only environmental limitation was to avoid concentrated exposure to hazards (machinery, heights, etc.) "due to obesity." (Tr. at 323.)  The evaluator noted:

> Daily activities include: watching TV, working on computer, going to MD appt., shopping, going to church, taking naps, reading, and crying. Does laundry, cleaning, but needs reminders to take meds, finish laundry, or to be reminded of what she is doing. Claims to have trouble concentrating due to Has [headaches]. She states that she helps her disabled husband get dressed and take Rx [medication], however she also reports that he is able to fix their meals. She does not claim to have any physical limitations, primary complaint is that concentrating gives her a headache. Claimant is

13

credible...

Claimant is capable of light work activity as per objective evidence in file.

(Tr. at 324-26.)

A Charleston Area Medical Center ["CAMC"] "Appointment Encounter Record" dated March 5, 2007, states: "53 year old white female with history of tumors of scalp and brain - has mesh plate. Patient here to establish care.  Patient still having headaches (different than tumor).  Insulin dependant since 12/23/2005." (Tr. at 370, 465.)

On March 29, 2007, a State agency medical source completed a Physical Residual Functional Capacity Assessment and opined that Claimant could perform light work with the exertional ability to occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk and sit (with normal breaks) for a total of about 6 hours in an 8-hour workday, and to have unlimited push and/or pull abilities. (Tr. at 377.)  Claimant was found to be able to occasionally perform all postural activities except climbing ladder/rope/scaffolds.  (Tr. at 378.) Claimant was determined to have no manipulative, visual, or communicative limitations.  (Tr. at 379-80.) Claimant's only environmental limitation was to avoid concentrated exposure to hazards (machinery, heights, etc.).  (Tr. at 380.)  The evaluator, Rosalind Go, M.D. noted:

Her allegations are partially credible as they are partially supported by medical evidence of records.  She did not leave her job due to her medical condition; but

14

> she has a h/o [history of] Diabetes Mellitus, headaches,
> HPN [hypertension], kidney problem, and depression, that
> she alleges to be disabling.  She alleges concentrating
> gives her headaches which is disabling to her.   The
> medical evidence of records do not substantiate the
> extreme limitations alleged by claimant.  Her pains and
> symptoms will restrict her to do light work but not to
> preclude all types of work-related activities.

(Tr. at 381.)

On June 28, 2007, Claimant had a head CT [computerized

tomography] without contrast at CAMC per the request of WV Health

Right.  (Tr. at 405, 419, 435.)  Stephen M. Elksnis, M.D. stated:

> HISTORY: Hemangiomas removed in 1998 now with patient
> having severe headaches.
>
> There are postoperative changes in the frontal skull with
> synthetic mesh overlying the expected location of the
> frontal bone.  There appears to be air within the mesh or
> perhaps deep to mesh of uncertain clinical significance.
> An infectious process cannot be excluded.  There is no
> evidence for abnormal density within the brain.  There is
> no evidence for hemorrhage or mass within parenchyma.
> The ventricles are normal in size.
>
> IMPRESSION: Suspect mesh and packing overlying the
> frontal lobes.  No evidence for intracranial hemorrhage
> or mass.

(Id.)

On August 6, 2007, Claimant had follow-up at CAMC for

"headaches...right foot pain...need refills."  (Tr. at 459-60.)

On September 11, 2007, Claimant presented to CAMC Emergency

Department with complaints of sore throat, cough, and congestion.

(Tr. at 437.)  Leon S. Kwei, M.D. stated:

> The patient has normal vital signs and no abnormal
> findings on her exam.  She has no signs of a bacterial
> focus for infection.  She will be treated supportively

15

> and symptomatically for which is likely viral in etiology
> and will follow up with her primary care doctor at the
> Medicine Clinic in 1 week if not better.

(Tr. at 437-38.)

On November 5, 2007, Claimant had an x-ray of her right femur
at CAMC because she stated she had a "lump [on her] right leg -
there for years - growing over last year per patient."  (Tr. at
457.)   Russell F. King, II, M.D. stated: "FINDINGS: There are no
comparisons.  Four views were obtained.  There is no local bone
lesion, osseous loose body, or fracture.  Hip joint is
unremarkable. IMPRESSION: Negative right femur."  (Tr. at 445.)

On November 19, 2007, Liz Young, M.D. completed a "Diabetes
Mellitus Residual Functional Capacity Questionnaire" form for
Claimant's representative and enclosed Claimant's diabetic
readings.  (Tr. at 468-82.)  The form states that Claimant's "first
visit 3/5/07 - see every 3 mo [months]...thigh mass right leg."
(Tr. at 469.)   The form also checks that Claimant's symptoms are
"headaches" and "vertigo" and that she "seldom" experiences
symptoms associates with diabetes severe enough to interfere with
attention and concentration.  (Tr. at 469-70.)  She opined that
Claimant could occasionally twist, stoop, crouch, climb ladders,
climb stairs, lift and carry up to 20 pounds.  (Tr. at 471.)
Claimant did not have significant limitations in reaching,
handling, or fingering.  (Id.)  Dr. Young notes that the claimant
should not be exposed to pulmonary irritants, temperature extremes,

16

or humidity.  (Tr. at 472.)  She estimated that, on the average, Claimant would be absent about one day per month from work as a result of the impairments or treatment.  (Id.)

On July 17, 2008, Claimant had a lipoma[2] surgically removed from her right thigh by Robert C. Cochran, M.D., at CAMC.  (Tr. at 529-34.)  The pathologist, Telly M. Barreta, M.D. stated: "Intramuscular lipoma (4 X 2 X 2 CM), with intermingling of mature adipose tissue and striated muscle bundles, extending to the resection margins.  Comment: Intramuscular lipoma tends to recur." (Tr. at 529.)

On July 24, 2008, Claimant visited West Virginia Health Right, Inc. as follow-up to her headaches.  Although the handwritten notes are largely illegible, the word "stable" is legible.  (Tr. at 536.)

Psychiatric Evidence

An undated "Psychological Services Summary" from Janet W. Adkins, M.A., licensed psychologist, states that Claimant had

> 10 individual sessions from July 26, 2006 to November 14, 2006 plus involvement in her daughter's therapy over that same period of time... Florinda Spaulding is very anxious and depressed.  Her husband is disabled, cannot work, and his disability is worsening.  Also, Linda has recently learned that her daughter, now in her teens, was sexually abused (raped) when only a preschool child by Florinda's step father.  And Linda herself has health problems, she has had a tumor removed from her...brain and still has problems with headaches.  Linda's family reports she has had problems with anxiety and depression before these present circumstances... Linda has become the care giver

---

[2] A lipoma is a slow-growing, noncancerous fatty lump. Http://www.mayoclinic.com/health/lipoma/DS00634.

17

for her mother and they had a close relationship, but all this is breaking up because of the sex abuse of her daughter and her mother's denial of this... Linda has been searching for employment, but now she has to be with her husband or have someone to be able to replace her as he cannot safely be left alone...

OUTCOMES: Florinda "Linda" Spaulding benefitted some from therapy.  She did eventually agree and sought treatment by a psychiatrist.  Medication did help.  She did get some control over her extreme distress over the knowledge her daughter had been raped.  The loss of her relationship with her mother continues to be a problem. She left therapy primarily because she could not leave her husband alone and it caused him increase in pain to accompany her to the sessions.

(Tr. at 314-15.)

Records indicate Claimant received treatment at Prestera Mental Health Centers on December 7, 2006, December 18, 2006, January 15, 2007, February 12, 2007, March 12, 1007, April 9, 2007, May 10, 2007, July 9, 2007, September 6, 2007, October 4, 2007, November 8, 2007, January 10, 2008, January 31, 2008, March 6, 2008, April 2, 2008, April 30, 2008, May 9, 2008, and May 29, 2008. (Tr. at 361-69, 408-17, 493-527.) Notes indicate that treatment is "to focus on improving client's coping mechanisms while decreasing anxiety and depressive symptoms." (Tr. at 365, 408-10.)

On January 3, 2007, Kelly Robinson, M.A., licensed psychologist, provided a consultative examination report wherein she concluded that Claimant had "Major Depressive Disorder, Recurrent, Moderate." (Tr. at 330.) She further found that Claimant's social functioning, concentration, persistence, and pace were within normal limits and that Claimant was capable of managing

18

any benefits she might receive.  (Tr. at 331.)

On January 12, 2007, a State agency medical source completed a Psychiatric Review Technique form.  (Tr. at 333-46.)  The evaluator, Karl G. Hursey, found Claimant's affective disorder impairment was not severe.  (Tr. at 333-36.)  He found Claimant had mild restrictions of activities of daily living and difficulties in maintaining social functioning.  (Tr. at 343.)  He also concluded that Claimant had no difficulties in maintaining concentration, persistence, or pace and no episodes of decompensation, each of extended duration.  (Id.)  He stated that evidence does not establish the presence of the "C" criteria.  (Tr. at 344.)

On March 30, 2007, a State agency medical source completed a Psychiatric Review Technique form.  (Tr. at 384-97.)  The evaluator, Jeffrey Harlow, Ph.D., found Claimant's affective disorder impairment was not severe.  (Tr. at 384.)  He found Claimant had no restrictions of activities of daily living, no difficulties in maintaining social functioning, concentration, persistence, or pace, and no episodes of decompensation, each of extended duration.  (Tr. at 394.)  He stated that evidence does not establish the presence of the "C" criteria.  (Tr. at 395.)  Dr. Harlow concluded: "Claimant statements about functional capacity limitations are partially credible because they are inconsistent with consultative evaluation findings.  Because KEY Functional Capacities are indicated to be mildly deficient or within normal

19

limits, it is concluded that the claimant's mental impairment is not severe." (Tr. at 396.)

On July 9, 2008, Melissa Hoover, BSW [Bachelor's Social Work], Prestera Mental Health Centers, completed a "Mental Impairment Questionnaire" form for Claimant's representative. (Tr. at 483-89.) Ms. Hoover stated:

> Client is seen at least 1x [time] every 3 months...(for) Major Depression Moderate Recurrent...Client is currently participating in assessment and medication services along with case management. Client's symptoms have decreased slightly since onset of treatment. Client's prognosis remains guarded... Lexapro 20 mg... (causes) drowsiness/dizziness. [Claimant] should not participate in activities that require alertness such as driving or using machinery... Client's symptoms result in a moderate level of dysfunction in the areas of concentration/task performance and social/interpersonal accompanied by mild dysfunction in the areas of self-care and community living.

(Tr. at 484.)

Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because the ALJ erred when she (1) failed to find Claimant fully credible, (2) failed to give greater weight to the opinion of Claimant's physician, Liz Young, M.D., (3) failed to find Claimant's mental illness severe; (4) determined Claimant had the residual functional capacity ["RFC"] to perform light work because her combination of impairments equals a listed impairment, that she could perform her past relevant work and that there were jobs that existed in significant numbers in the

20

regional economy that Claimant could have performed. (Pl.'s Br. at 3-13.)

The Commissioner argues that substantial evidence supports the ALJ's Decision that (1) Claimant's subjective complaints of pain were not fully credible; (2) the ALJ's RFC assessment was consistent with the limitations reported by Dr. Young; (3) Claimant did not have a severe mental impairment; and (4) Claimant had the RFC to perform a limited range of light work, could perform her past relevant work, and that her impairments did not meet or equal any of the listed impairments. (Def.'s Br. at 9-17.)

<u>Credibility Determination</u>

Claimant first asserts that the ALJ erred when she failed to find Claimant fully credible and concluded "that the record as a whole indicates an overall 'stable' medical condition and does not support 'debilitating' symptoms." (Pl.'s Br. at 3.) Claimant further asserts that "because her allegations and the medical evidence of record are mutually supportive" this gives credibility to her statements. (Pl.'s Br. at 9-11.)

The Commissioner responds that substantial evidence supports the ALJ's finding that Claimant's subjective complaints of pain were not fully credible because (1) her condition was reported as stable in the most recent clinic notes, (2) her statements regarding headaches were inconsistent, and (3) she had a wide range of daily activities which supported that she was capable of

performing a limited range of light work on and prior to her date last insured. (Def.'s Br. at 13-14.)

The ALJ wrote a very thorough thirteen-page decision, which included a full analysis of Claimant's impairments and the medical evidence of record, including Claimant's daily activities. (Tr. at 9-21.) The ALJ made these specific findings regarding Claimant's credibility:

> After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment for the reasons explained below.
>
> As previously discussed in the body of this decision, aside from allegations of chronic headache pain and obesity, the evidence does not establish "severe" impairment in any other regard despite the claimant's ongoing complaints. With regard to her chronic headache pain, relevant treatment notes indicate that while her headache pain has persisted, she has reported pain to a lesser degree with treatment. For the relevant time period prior to her second surgery in early 2006, repeat magnetic resonance imagining (MRI) studies of the brain revealed no evidence of recurrent neoplastic involvement, or specific vascular abnormality and only post-craniotomy changes (Exhibit 3F). February 3, 2006 neurological evaluation by Dr. Rida Mazagri revealed no neurological findings of significance, and it is indicated that she had an uneventful hospital course in February 2006 when she underwent removal of plating, placement of new plating, and methylacrylic cement cranioplasty (Exhibits 4F and 5F). Post-operative examinations and studies since have been similarly stable with no evidence of recurring tumor or new area of abnormal enhancement, and although she did require re-exploration and removal of hardware in October 2006, there is no indication that she experienced any complications of this procedure. Later computerized tomography (CT) scan in January 2007 was

22

suspicious for mesh and packing overlying the frontal lobes; however, again, there was no evidence for intracranial hemorrhage or mass (Exhibit 21F).  Relevant treatment notes during this time period from CAMC similarly reflect that she reported subjective improvement in symptoms with medication ("headaches not too bad"), and although medication was adjusted thereafter, on later follow-ups in mid to late 2007, improvement was again reported by the claimant.  It is indicated that associated vertigo symptoms resolved spontaneously, and treatment notes to include last documented follow-up at West Virginia Health Right, Inc. reflect the claimant's headaches to be "stable" contrary to her subjective reports (Exhibit 32F).

In November 2007, Dr. Liz Young, treating physician, indicated that emotional factors do not contribute to the severity of the claimant's headache symptoms, and Dr. Young, while assessing somewhat dissimilar limitations, otherwise indicates that the claimant remains capable of engaging in a reduced range of light work activity (Exhibit 25F)...

It is indicated that the claimant's neurological status has not changed and in this regard, Dr. Mazagri has noted no evidence of neurological dysfunction...Dr. Mazagri has noted her memory to be grossly intact...There is no visual defect...She exhibits normal muscle strength in all four extremities graded 5/5, and sensation is normal to touch and pinprick in all four extremities.  She exhibits a normal gait, including heel/toe walking, and no cerebellar dysfunction is seen.  Examination of head has repeatedly shown well-healed incisions and no signs of infection...There is no indication that she has required significant or frequent emergent care treatment or inpatient stabilization since last hospitalization... On last documented examination by Dr. Mazagri in November 2006, her symptoms were felt to be related to cervical spondylosis and only "mild" clinical signs were noted in this regard (Exhibit 5F)...

Again, last documented clinic notes reflect her condition to be "stable," and while it is indicated that weight loss will definitely help her overall mobility, there is no indication that the claimant has actively or aggressively pursued a weight loss regimen on a consistent basis.  There have also been some inconsistencies in her statements with regard to symptom

23

severity, etc. as for example, she testified on
questioning by the undersigned that her headaches occur
on the frequency of only once or twice a week; however,
when further questioned by counsel, she doubled that
figure reporting headaches up to four times per week.
Overall, the available evidence of record does not
support the symptom severity and/or functional limitation
described by the claimant and simply is not supportive of
"disabling" impairment.    Accordingly, her subjective
reports/accounts are not found to be fully credible, and
of further note, she reports that she stopped working to
solely care for her disabled spouse as she could no
longer tolerate working and providing his care at the
same time.

(Tr. at 17-19.)

With respect to Claimant's argument that the ALJ wrongfully
discredited Claimant's credibility, the court finds that the ALJ
properly weighed Claimant's subjective complaints of pain and her
credibility in keeping with the applicable regulations, case law,
and social security ruling ("SSR") and that her findings are
supported by substantial evidence.  20 C.F.R. § 404.1529(b) (2006);
SSR 96-7p, 1996 WL 374186 (July 2, 1996); Craig v. Chater, 76 F.3d
585, 594 (4th Cir. 1996).

In her decision, the ALJ determined that Claimant had
medically determinable impairments that could cause her alleged
symptoms. (Tr. at 17.) The ALJ's decision contains a thorough
consideration of Claimant's daily activities, the location,
duration, frequency, and intensity of Claimant's pain and other
symptoms, precipitating and aggravating factors, Claimant's
medication and side effects, and treatment other than medication.
(Tr. at 11-19.) The ALJ explained her reasons for finding Claimant

24

not entirely credible, including the objective findings, Claimant's treatment, the lack of evidence of side effects which would impact Claimant's ability to perform her past relevant work, and her broad range of self-reported daily activities. (<u>Id</u>.) Additionally, the ALJ did not err in stating that the last documented clinic notes do reflect Claimant's condition to be "stable." (Tr. at 19, 536.)

<u>Treating Physician</u>

Claimant next argues that the ALJ erred when she failed to give greater weight to the opinion of Claimant's physician, Liz Young, M.D. (Pl.'s Br. at 3-5.) Specifically, Claimant states: "The record clearly supports Dr. Young's statement in November 2007 that revealed the Plaintiff can only engage in a reduced range of light work." (Pl.'s Br. at 3.)

The Commissioner responds: "This argument makes little sense because there is no conflict between Dr. Young's opinion and the ALJ's RFC assessment. Instead, both Dr. Young and the ALJ found that Plaintiff was capable of performing a limited range of light work (Tr. 15, Finding No. 5; 469-72)." (Def.'s Br. at 9-10.)

The ALJ discussed the only report from Liz Young, M.D., a form titled "Diabetes Mellitus Residual Functional Capacity Questionnaire", dated November 19, 2007 (Tr. at 469-72):

> In November 2007, Dr. Liz Young, treating physician, indicated that emotional factors do not contribute to the severity of the claimant's headache symptoms, and Dr. Young, while assessing somewhat dissimilar limitations, otherwise indicates that the claimant remains capable of engaging in a reduced range of light work activity

25

(Exhibit 25F).  Dr. Young does not provide an assessment
with regard to the claimant's ability to sit, stand, and
walk but notes that she does not require a sit/stand
option indicating that the claimant does not have any
particular difficulties tolerating prolonged positioning.
While she indicates that the claimant may require
unscheduled breaks if her blood sugar level drops, as
indicated in the body of this decision, the relevant
treatment evidence and the claimant's own reports
indicate that the claimant's diabetes is well-controlled
with proper adherence to treatment measures.  Dr. Young
indicates that the claimant does not require her feet to
be elevated with prolonged sitting and additionally notes
that use of a cane is not required.  She notes that the
claimant should not be exposed to pulmonary irritants,
temperature extremes, or humidity; however, provides no
supportive rationale or objective findings to support
limitation in this regard.  Otherwise, she assesses that
the claimant is restricted to but capable of
lifting/carrying up to 20 pounds maximum and can
occasionally twist, stoop, crouch, and climb.

(Tr. at 18.)

In evaluating the opinions of treating sources, the
Commissioner generally must give more weight to the opinion of a
treating physician because the physician is often most able to
provide "a detailed, longitudinal picture" of a claimant's alleged
disability.  See 20 C.F.R. § 404.1527(d)(2) (2005).  Thus, a
treating physician's opinion is afforded "controlling weight only
if two conditions are met: (1) that it is supported by clinical and
laboratory diagnostic techniques and (2) that it is not
inconsistent with other substantial evidence." Ward v. Chater, 924
F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. §
404.1527(d)(2) (2005).

Under § 404.1527(d)(2)(ii), the more knowledge a treating

26

source has about a claimant's impairment, the more weight will be given to the source's opinion.  Section 404.1527(d)(3), (4), and (5) adds the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty). Additionally, the regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."  § 404.1527(d)(2).

Under § 404.1527(d)(1), more weight generally is given to an examiner than to a non-examiner.  Section 404.1527(d)(2) provides that more weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources). The Fourth Circuit Court of Appeals has held that "a non-examining physician's opinion cannot by itself, serve as substantial evidence supporting a denial of disability benefits when it is contradicted by all of the other evidence in the record." Martin v. Secretary of Health, Education and Welfare, 492 F.2d 905, 908 (4th Cir. 1974); Hayes v. Gardener, 376 F.2d 517, 520-21 (4th Cir. 1967). Thus, the opinion "of a non-examining physician can be relied upon when it is consistent with the record." Smith v. Schweiker, 795

27

F.2d 343, 346 (4th Cir. 1986).

With respect to Claimant's argument that the ALJ gave insufficient weight to Dr. Young's opinion, the court finds that the ALJ properly considered the treating physician's opinion in keeping with the applicable regulations, case law, and social security ruling ("SSR") and that her findings are supported by substantial evidence. In fact, there is no disagreement between the ALJ and Dr. Young as to Claimant's RFC assessment; both concluded the Claimant is capable of performing a limited range of light work. (Tr. at 15, 469-72; Pl.'s Br. at 3.)

<u>Severe Mental Impairment</u>

Claimant next asserts that the ALJ erred in determining that Claimant's "mental illnesses were not severe enough to prevent the Plaintiff from working." (Pl.'s Br. at 6.) Specifically, Claimant asserts that her "moderate mental illnesses should be deemed a non-severe impairment that nonetheless limits her ability to work." (Pl.'s Br. at 6-7.)

The Commissioner responds that substantial evidence supports the ALJ's finding that "Plaintiff did not have a severe mental impairment because the record showed that Plaintiff's mild, situational psychological problems would not significantly limit her ability to do basic work activities on or prior to her date last insured... The record reflects that Plaintiff's situational psychiatric distress benefitted from therapy and medication."

(Def.'s Br. at 10-11.)

The ALJ discussed Claimant's psychiatric condition and treatment at great length before reaching the conclusion that Claimant had no work-related limitations secondary to mental impairment. (Tr. at 12-15.) Specifically, the ALJ stated:

> The claimant reports ongoing psychiatric distress during the relevant time period; however, consistent with the prior findings of the State agency psychological consultants, the undersigned finds such impairment to be "non-severe" based upon the evidence of record (Exhibits 8F, 12F, 14F, 16F, 21F, 23F, and 30F). In this regard, the claimant reports that she is very anxious and depressed and that she has been experiencing crying spells, excessive worry, concentrational difficulties, and distractability with numerous stressors including the responsibility of caring for her disabled spouse, issues related to her daughter, and preoccupation with her own physical health concerns. The record reflects that she was involved with Adkins Psychological Services from July 2006 to November 2006; however, a review of such evidence reflects that she did benefit from therapy and that medication and therapy was successful in helping her achieve some control over her psychiatric distress (Exhibit 8F). Documented objective findings at this facility are minimal, and intake mental status examination at Prestera Center for Mental Health Services in December 2006 are not significantly remarkable and revealed goal-directed thought processing, no evidence of delusions or perceptual disturbances, and no other findings to support the severity of her claims (Exhibit 16F). Similarly, mental status examinations on agency-sponsored consultative psychological evaluation in January 2007 was not significantly remarkable...Although Melissa Hoover, BSW, treating therapist, has provided an essentially disabling mental residual functional capacity assessment, the degree of limitation indicated by Ms. Hoover, noting the claimant to be incapable of meeting competitive standards in numerous areas related to mental functioning, is not supported by the documented treatment notes from Prestera Center nor is such a degree of limitation supported by the evidence as a whole, including the earlier findings noted herein. Moreover, Ms. Hoover is not an "acceptable medical source,"

> according to the Regulations, and relevant treatment notes conversely indicate that the claimant experienced significant, not "slight" as indicated, improvement in symptoms with compliance to treatment (Exhibits 23F and 30F)... Although still complaining of situation stressors, follow-up in May 2008 reflected no worsening of her mental state, and there is no indication that she has required crisis intervention or inpatient stabilization at any time relevant to this decision...
>
> The State agency psychological consultants found no evidence to support severe mental impairment on earlier agency reviews (Exhibits 14F and 21F), and in finding "non-severe" mental impairment, the undersigned has considered the four broad functional areas set out in the disability regulations for evaluating mental disorders and in section 12.00C of the Listing of Impairments (20 CFR, Part 404, Subpart P, Appendix 1). These four broad functional areas are known as the "paragraph B" criteria...[wherein the ALJ discussed at length the four areas with specificity to Claimant's record].

(Tr. at 12-14.)

When evaluating a claimant's mental impairments, the Social Security Administration uses a special sequential analysis outlined at 20 C.F.R. §§ 404.1520a and 416.920a. The ALJ used the sequential analysis. First, symptoms, signs, and laboratory findings are evaluated to determine whether a claimant has a medically determinable mental impairment. §§ 404.1520a(b)(1) and 416.920a(b)(1)(2010). Second, if the ALJ determines that an impairment(s) exists, the ALJ must specify in his/her decision the symptoms, signs, and laboratory findings that substantiate the presence of the impairment(s). §§ 404.1520a(b)(1) and (e), 416.920a(b)(1) and (e)(2010). Third, the ALJ then must rate the degree of functional limitation resulting from the impairment(s).

30

§§ 404.1520a(b)(2) and 416.920a(b)(2)(2010). Functional limitation is rated with respect to four broad areas (activities of daily living, social functioning, concentration, persistence or pace, and episodes of decompensation). §§ 404.1520a(c)(3) and 416.920a(c)(3) (2010). The first three areas are rated on a five-point scale: None, mild, moderate, marked, and extreme. The fourth area is rated on a four-point scale: None, one or two, three, four or more. §§ 404.1520a(c)(4) and 416.920a(c)(4) (2010). A rating of "none" or "mild" in the first three areas, and a rating of "none" in the fourth area will generally lead to a conclusion that the mental impairment is not "severe," unless the evidence indicates otherwise. §§ 404.1520a(d)(1) and 416.920a(d)(1) (2010). Fourth, if a mental impairment is "severe," the ALJ will determine if it meets or is equivalent in severity to a mental disorder listed in Appendix 1. §§ 404.1520a(d)(2) and 416.920a(d)(2) (2010). Fifth, if a mental impairment is "severe" but does not meet the criteria in the Listings, the ALJ will assess the claimant's residual functional capacity. §§ 404.1520a(d)(3) and 416.920a(d)(3) (2010). The ALJ incorporates the findings derived from the analysis in the ALJ's decision:

> The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

§§ 404.1520a(e)(2) and 416.920a(e)(2) (2010).

With respect to Claimant's argument that the ALJ erred in failing to find her "moderate mental illnesses...a non-severe impairment that...limits her ability to work", the court finds this argument to be without merit.  The Claimant's medical evidence of record does not demonstrate that she has a mental impairment that would significantly limit her ability to do basic work activities. The ALJ properly considered the applicable regulations and her findings are supported by substantial evidence.

Listed Impairments

Claimant next argues that the ALJ erred when she determined that Claimant had the residual functional capacity ["RFC"] to perform light work because her combination of impairments equals a listed impairment. (Pl.'s Br. at 7-9.) Specifically, Claimant asserts: "Obviously, the Plaintiff's impairments in combination equal a listed impairment and prevent her from working... Plaintiff's two brain surgeries and screw removal should be sufficient to establish pain at a level that would prevent the Plaintiff from working." (Pl.'s Br. at 8-9.)

The Commissioner responds that substantial evidence supports the ALJ's determination that Claimant's impairments did not meet or equal any of the listed impairments. (Def.'s Br. at 12-13.)

Contrary to Claimant's assertions, the ALJ did consider her combination of impairments in finding that they did not equal any

32

of the listed impairments:

> As described under Section 11.00 dealing with neurological system, the evidence does not document any history of epilepsy/seizure activity or central nervous system vascular accident stemming from the claimant's recurrent meningioma as required by relevant neurologic listing 11.05 dealing with brain tumors and by reference listings 11.02, 11.03, and 11.04. Moreover, further evaluation under mental disorders listing 12.02, as required by listing 11.05, does not document psychological or behavioral dysfunction of the brain as described under this section resulting in "marked" restriction in at least two areas of functioning... Nor does the evidence satisfy the "C" criteria as also described under this listing.

> Pursuant to Social Security Ruling 02-1p, I have also considered the claimant's obesity and the combined effect of her impairments, and while the claimant's obesity may increase the severity of coexisting and related impairments, the evidence does not establish presumptive disability.

> Furthermore, after reviewing all of the evidence, including the medical records, and considering the interactive and cumulative effects of all medically determinable impairments, including any impairments that are "severe" and/or "non-severe," the undersigned finds that the claimant does not have a combination of impairments that meet or medically equal any listed impairment in Appendix 1 to Subpart P of Regulations No. 4.

(Tr. at 15.)

"The Listing of Impairments describes, for each of the major body systems, impairments that are considered severe enough to prevent an adult from doing any gainful activity," see 20 C.F.R. § 404.1525(a)(2010), regardless of age, education or work experience, see Sullivan v. Zebley, 493 U.S. 521, 532 (1990). "For a claimant to qualify for benefits by showing that his unlisted impairment, or

combination of impairments, is 'equivalent' to a listed impairment, he must present medical findings equal in severity to all the criteria for the one most similar listed impairment." <u>See</u> <u>id.</u> at 531.

With respect to Claimant's argument that the ALJ erred because her combination of impairments equals a listed impairment, the court finds this argument to be without merit. Under the regulations, it is Claimant's burden to prove that her condition equals the criteria of one of the listed impairments, yet Claimant does not even attempt to specify which listing she believes her conditions meet. Accordingly, the ALJ did not err in concluding that there is no evidence to support that a combination of Claimant's impairments equaled a listed impairment.

<u>Past Relevant Work</u>

Claimant further argues that the ALJ erred in concluding that she could perform her past relevant work. (Pl.'s Br. at 11-12.) Claimant asserts that her depression "symptoms would not coincide well with her previous work." (Pl.'s Br. at 12.)

The Commissioner responds that substantial evidence supports the ALJ's finding that Claimant could perform her past relevant work prior to her date last insured because Claimant's own description of these jobs demonstrated that neither job required tasks in excess of her RFC. (Def.'s Br. at 14-15, Tr. at 144-46.)

The ALJ found: "The claimant has past relevant work as an

34

accounts receivable clerk (classified by the vocational expert as
sedentary exertional skilled work activity) and accounts
receivable/purchasing agent (classified as light skilled work
activity). It was the testimony of the vocational expert that the
claimant remained capable of performing such work activity as
actually performed and as normally performed in the economy." (Tr.
at 19.)

With respect to Claimant's argument that the ALJ erred in
concluding that Claimant could perform her past relevant work, the
court finds this argument has no merit. Claimant's own Work
History Report, Form SSA-3369, and the VE testimony support that
Claimant retains the RFC to perform her past relevant work. (Tr.
at 50-51, 144-46.)

Further, the court finds that Claimant's argument that the ALJ
erred in finding that the transferability of job skills was not
material to the determination of disability in her case is also
without merit. (Pl.'s Br. at 11-13.) The issue of transferability
of skills, as well as Claimant's age, are not material to
Claimant's case because the ALJ found that she could perform her
past relevant work at step 4 of the sequential evaluation process,
and the disability inquiry stopped. (Tr. at 19.) See 20 C.F.R. §
404.1520(4)(2010). The issue of transferability of skills only
becomes relevant at step 5 of the evaluation process. See 20
C.F.R. § 404.1560(b)(3)(2010).

Finally, Claimant argues that she should be found disabled based upon the vocational expert's testimony that Claimant would not be able to work if she had to miss more than four days per month, as assessed by Ms. Hoover, her therapist. (Pl.'s Br. at 12; Tr. at 52-53.)  The court finds this argument, too, is without merit. An ALJ is not required to accept a vocational expert's testimony in response to hypothetical limitations that are not supported by the record.  Further, as previously discussed, Ms. Hoover's RFC assessment was inconsistent with the other evidence of record and she is not an "acceptable medical source." (Tr. at 13.)

After a careful consideration of the evidence of record, the court finds that the Commissioner's decision is supported by substantial evidence.  Accordingly, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this court.

The Clerk is directed to transmit copies of this Order to all counsel of record.

ENTER: September 14, 2010

Mary E. Stanley
United States Magistrate Judge